# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 24 2016, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ana M. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In The Matter Of The Termination Of The Parent-Child Relationship Of: A.J. and A.C., (Minor Children), <br><br> and <br><br> M.J., (Father), <br> *Appellant-Respondent*, <br><br> v. <br><br> The Indiana Department of Child Services, <br> *Appellee-Petitioner*. | March 24, 2016 <br><br> Court of Appeals Case No. 18A02-1510-JT-1581 <br><br> Appeal from the Delaware Circuit Court <br><br> The Honorable Kimberly S. Dowling, Judge <br><br> The Honorable Brian M. Pierce, Magistrate <br><br> Trial Court Cause Nos. 18C02-1410-JT-43 18C02-1410-JT-44 |

**Brown, Judge.**

[1] M.J. ("Father") appeals the involuntary termination of his parental rights with respect to his children A.J. and A.C. (the "Children"). Father raises one issue, which we revise and restate as whether the evidence is sufficient to support the termination of his parental rights. We affirm.

## Facts and Procedural History

[2] Father and S.J. ("Mother") had a daughter, A.J., born on August 28, 2006, and a son, A.C., born on November 17, 2009.

[3] In January 2013, the State charged Father with criminal confinement, domestic battery, strangulation, and criminal mischief, and Father later pled guilty to criminal mischief. On January 31, 2014, the State charged Father with theft and receiving stolen property, and Father pled guilty to theft on June 17, 2014. In March 2014, the State charged Father with theft and resisting law enforcement, and Father pled guilty to theft on June 11, 2014. In October 2014, the State charged Father with theft and resisting law enforcement while Father was "under probation and under house arrest." Transcript at 75. On April 13, 2015, Father pled guilty to theft as a misdemeanor.

[4] Meanwhile, on January 23, 2014, the Department of Child Services ("DCS") filed petitions alleging that A.J. and A.C. were children in need of services ("CHINS") due to Mother being hospitalized after injecting herself with bleach while the Children were in her care, that Father and Mother have a history of abusing drugs, specifically morphine, in the Children's presence, that Father

and Mother have a history of domestic violence in the Children's presence, and that DCS was unable to physically locate Father.

[5] On February 17, 2014, the court held an initial hearing at which Father failed to appear and Mother admitted the allegations that she was hospitalized in January 2014 after injecting herself with bleach while the Children were in her care, and that she and Father had a history of domestic violence in the Children's presence.

[6] On March 17, 2014, the court held a hearing, and DCS reported that Father was incarcerated in the Howard County Jail and was unable to appear. On April 14, 2014, the court held a hearing, Father admitted that the Children were CHINS, and the court adjudged the Children to be CHINS.

[7] On April 25, 2014, the court entered Dispositional and Parental Participation Orders with respect to Father which ordered him to follow the recommendations of the DCS and providers, participate in home-based case work focusing on parenting, participate in individual counseling, participate in the recommendations of the substance abuse counselor at Meridian Services, and submit to random drug screens. On June 25, 2014, the family case manager filed a Notice of Parent Living in the Relative Home which stated that Father was released from the Delaware County Jail on June 17, 2014, had signed a safety plan concerning the Children, and had fully cooperated with DCS since his release from incarceration.

[8] In July 2014, Father was referred to the intensive outpatient treatment program (the "IOT program"), completed that program in September 2014, and was then referred to an aftercare program which he did not complete. Al Adams, an addictions counselor, scheduled a meeting for September 26, 2014, to discuss Father's positive drug screen and discrepancies regarding Father's statements regarding the last time he used drugs, and sent Father a letter and left him a voicemail, but Father failed to appear. Father did not meet with Adams after September 16, 2014, until February 26, 2015.

[9] Meanwhile, on August 5, 2014, the family case manager filed a Notice of Placement in Foster Care which asserted that Father had not been in contact with the family case manager since July 31, 2014, was considered non-compliant with his substance abuse treatment, missed his fifth scheduled drug screen on August 4, 2014, and failed to participate in individual counseling at Meridian Services. The Notice also asserted that A.J. had twenty-eight tardies and five absences since being placed in the grandmother's home from February 11, 2014, to the end of the school year.

[10] On October 1, 2014, DCS filed petitions for the involuntary termination of Father's parental rights to the Children.[1] On November 5, 2014, the court ordered the Children to be placed with the maternal grandparents.

---

[1] DCS also filed a petition for the involuntary termination of Mother's parental rights to the Children. Mother later consented to adoption.

[11] On February 3, 2015, DCS filed a Motion to Terminate Reunification Services alleging that the Children had not been returned to the care of either parent since being removed on February 11, 2014, that parents failed to comply with substance abuse treatment, parents had failed to consistently make themselves available to the family case manager for drug screens, neither parent complied with individual therapy, and that the parents had not improved their ability to safely parent the Children.

[12] On February 4, 2015, the court appointed special advocate ("CASA") filed an Emergency Petition for Suspension of Visitation alleging that the Children reported seeing Father dropping off Mother for Mother's visit, there is a long history of domestic violence between Father and Mother, Mother shared adult information with the Children and cursed at them, and that Father admitted on January 28, 2015, that he had too many emotional issues to raise the Children, that he was working on reuniting with Mother even though she was not good for him, and that they tend to focus on drugs when together. The CASA stated that A.J. reported being frightened by the news of her parents' renewed relationship, and that the grandparents reported they were concerned that Mother was under the influence of some illicit substance on January 28, 2015. On February 6, 2015, the court held a hearing and ordered that the permanency plan for the Children be adoption.

[13] On February 26, 2015, Adams recommended to Father that he complete the IOT program, and Father said that he wanted to take soboxone. Adams then

referred Father to the Opioid Addiction Treatment program (the "OAT program").

[14]  On March 9, 2015, Aaron Mocherman, a mental health therapist and addictions counselor at Meridian Health Services, met with Father, discussed the requirements of the OAT program, and scheduled several months of individual and group appointments. Father did not attend the next individual session or the next group session. Mocherman did not have any contact with Father until June 2015. Due to Father's lack of attendance, Mocherman did not consider Father to be a part of the OAT program.

[15]  At some point, Father told Adams that his probation officer would not allow him to have soboxone. On June 9, 2015, Adams met with Father, and Father stated that he wanted to return to aftercare. Adams reviewed what had happened and informed Father that he would not place him back in the aftercare group, and Father asked to speak with his supervisor. Adams's supervisor explained the OAT program and referred Father back to Mocherman.

[16]  On June 15, 2015, Father completed another informed consent to restart the OAT program. Father stated that he had obtained a soboxone prescription outside of the OAT program which concerned Mocherman because it was not the preferred way that they administered treatment through the OAT program.

[17]  On July 24, 2015, the court held a termination hearing on DCS's petitions. The court heard testimony from Patricia Duncan, the program director of the child

advocacy center at Meridian Health Services, Adams, Mocherman, Father, Father's parents, Gail Baker, a behavioral clinician, and family case manager Susan Garrison-Brown ("FCM Garrison-Brown").

[18]     Father testified that he did not comply with the drug screening schedule. He admitted that his case manager appeared at his home on May 4, 2015, and requested a drug screen, and he refused. He conceded that while he completed an IOP program, there were issues with regard to aftercare, he did not complete the IOP program a second time, and that he did not comply with Adams's recommendations for substance abuse treatment. Father also stated that he wanted the court to believe that his own father, the grandfather of the Children and his employer, would not let him conduct a drug screen before he went to work at 7:30 a.m.

[19]     During Father's testimony, the court stated:

>        All you want to do is talk. And it doesn't help to be honest with you. Because you blame everybody else. Even if you're in treatment, you rarely if any of your testimony accepts [sic] responsibility. You blame your ex-wife, the mother of these children for being involved in the system when it was equal participation and equal failure on both you're [sic] parts. And you will sit here in the courtroom and blame her. You blame your father. You blame the case manager for not setting up drug screens when they work for you. When I don't believe for a minute that a painter, who paints, can't be at the job site at 7:45 and not 7:30 a.m.

Transcript at 101-102.

[20]   Father's father testified that he would expect Father to attend the drug screens twice a week and that the job was secondary. He also testified that Father never told him that he needed to take a drug screen at 7:30 a.m. twice a week. The court asked: "[D]id [Father] ever say, hey boss, I need to be at DCS at 7:30 a.m. to take a drug screen twice a week, can we work . . . ." *Id.* at 117. Father's father stated: "Not twice a week. There might have been a time or two he mentioned it earlier. I don't know. It hasn't been something I've thought about much of cause he's not asked me much about it." *Id.*

[21]   On September 1, 2015, the court entered orders terminating Father's parental rights, making detailed findings of fact, and concluding that there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement outside the home will not be remedied, that continuation of the parent-child relationship poses a threat to the Children's well-being, that termination of Father's parental rights was in the Children's best interests, and that adoption is a satisfactory plan for the Children.

### *Discussion*

[22]   The issue is whether the evidence is sufficient to support the termination of Father's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[23] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

[24] "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'"

*Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), *reh'g denied*)). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[25] Father asserts that DCS failed to establish with clear and convincing evidence that the conditions that resulted in the Children's removal from the home would not be remedied. He argues that he was incarcerated until June 17, 2014, he then obtained employment painting houses, and was living with his mother. Without citation to the record, Father states that he "had completed one IOT program and was beginning an OAT program" and had participated in individual and group counseling. Appellant's Brief at 20. He contends that he was participating in a Suboxone clinic, participated in visitation with the Children, did a good job on his visits, and was attempting to turn his life around and become a better parent.

[26] DCS asserts that Father does not challenge any of the trial court's findings of fact and that the unchallenged findings support the court's judgment. DCS also notes that Father challenges only one of the trial court's legal conclusions, i.e., that there was a reasonable probability that Father would not remedy

conditions, that he does not challenge the conclusion that continuation of the parent-child relationship posed a threat to the Children's well-being, and that accordingly, this court is obliged to affirm the trial court's order.

[27]  We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).  Father does not challenge the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children.  Nonetheless, we will address the merits of Father's argument and review whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See In re J.G. and C.G.*, 4 N.E.3d 814, 820 n.2 (Ind. Ct. App. 2014) (noting that mother did not challenge the trial court's finding that continuation of the parent-child relationship posed a threat to the well-being of the children and addressing the merits of mother's argument that the court erred when it concluded that there was a reasonable probability that the conditions that resulted in the removal of the children were not remedied), *trans. denied*; *In re J.T.*, 742 N.E.2d 509, 511-512 (Ind. Ct. App. 2001) (observing that mother did not challenge the trial court's finding that continuation of the parent-child relationship posed a threat to the child's well-being and that the statute was written in the disjunctive requiring the trial court to find only one of the two requirements of subsection (B) by clear and convincing evidence, but

nonetheless reviewing the evidence supporting the conclusion challenged by mother), *trans. denied*.

[28]     In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.*

[29]     A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the

circumstances, the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[30] The trial court's orders addressed Father's participation in therapy and services. Specifically, the court entered substantially similar separate orders with respect to A.J. and A.C. and in the order related to A.J. found:

> 5. This Court ordered that [Father] participate in home based case management, refrain from using illicit substances, participate in individual counseling, obtain a substance abuse evaluation and participate in the Intensive Outpatient Treatment Program, submit to random drug screens, participate in a visitation plan with the child, report to the DCS case manager any changes in his contact information, and to obtain sufficient income in order to maintain a home appropriate for the child. At the time of the dispositional hearing, [Father] was still incarcerated. Therefore, he was supposed to begin his services as soon as he was released from incarceration.

> 6. [Father] was released from incarceration on or about June 17, 2014 and began living with his mother, which was where [A.J.] was placed at that time. [Father] and [his mother] entered into a safety plan with DCS whereby [Father] agreed not to have any unsupervised contact with [A.J.] and not engage in the use of illegal drugs. However, by the next review hearing held on July 28, 2014, this court found that [Father] had not participated in court ordered services, had not regularly visited with [A.J.] and had not complied with [A.J.'s] case plan. Based upon the lack of cooperation with the placement and [Father's] lack of

compliance with services, this court authorized DCS to remove [A.J.] from the care of the paternal grandmother . . . .

7. On August 5, 2014 DCS provided notice to the court that [Father] had been non-compliant with his drug treatment, failed to maintain regular contact with the case manager, missed five (5) scheduled drug screens and failed to participate in individual therapy.

8. Father has a long history of substance abuse and [Father] continues to struggle with his addiction. Additionally, [Father] has been non-compliant with this court regarding drug screens and drug treatment. During the course of this case, [Father] missed ninety-one (91) drug screens, tested positive three (3) occasions and tested negative ten (10) times. Refusals or missed screens are considered to be positive screens. Therefore, [Father] tested positive on approximately eighty-eight (88) percent of his drug screens.

9. The depth of [Father's] non-compliance is demonstrated by his refusal to take a screen for FCM [Garrison-Brown] on May 4, 2015 and his missed screen on May 18, 2015. Both requested and refused screens occurred less than three (3) months prior to this termination fact-finding.

10. [Father] was not honest with the addictions counselor about a positive screen and relapse that occurred with [sic] he was in the Intensive Outpatient Treatment (IOT) program. When the addictions counselor attempted to set up a meeting to address the issue of the failed drug screen, [Father] failed to show up at the meeting. Between September 16, 2014 and February 26, 2015, [Father] failed to make any contact with his addictions counselor.

11. When [Father] did once again make contact with his addictions counselor in February 2015, [Father] requested to be put back into the aftercare program. When the counselor reminded [Father] that his recommendation was to place [Father] back into the IOT program due to his previous dishonesty, [Father] demanded to see the counselor's supervisor. This particular counselor, Al Adams, has over thirty-four years of experience in treating substance abuse. This action by [Father] is demonstrative of the attitude that he has had during this entire case. His refusal to comply with this court's orders, refusal to make himself available for drug screens, and refusal to comply with the recommendations of a treatment specialist with thirty-four years of experience all indicate to this court that [Father] will not comply with any future orders of this court.

12. [Father's] distortion of reality is reflected in his testimony concerning the Opioid Addiction Treatment (OAT) Program. After [Father] refused to re-enroll in IOT, [Father] was referred to the OAT Program. This intensive program consists of weekly individual and group therapy sessions and frequent drug screening to address opioid addiction. After a month to six weeks of this treatment, participants are evaluated to see if they would be an appropriate candidate for buprenorphine (Suboxone), which would be administered and regulated in conjunction with the OAT Program. The drug replacement therapy is one possible component of the OAT Program, but certainly not the main tool or a necessary component of the program. [Father] testified that his probation officer at that time would not allow him to take Suboxone and insinuated that his probation officer would not allow him to participate in the OAT Program. However, there was nothing keeping [Father] in [sic] fully participating in every other component of the OAT Program. When [Father] found out the strict requirements of the OAT Program prior to even being evaluated as a possible candidate to be placed on a drug replacement therapy regimen, he failed to follow through. [Father] made his initial

appointment on March 9, 2015 and then failed to appear for any subsequent therapy sessions until the middle of June.

13. Even after [Father] re-engaged in counseling in June, [he] was dishonest with his counselor when he indicated that FCM Garrison-Brown was regularly drug screening him. And instead of being evaluated for drug replacement therapy and monitored through the OAT program, [Father] instead chose to obtain a prescription for Suboxone through a physician located in another county. Such behavior illustrates the lengths to which [Father] will go to avoid accountability when it comes to treating his opioid addiction.

14. [Father] did not meaningfully participate in individual counseling, despite being court ordered to do so. [Father] participated in four (4) out of a possible forty-eight (48) counseling sessions. Because of [Father's] failure to take advantage of this service, individual counseling has not improved or enhanced [his] ability to provide proper care and treatment for [A.J.].

15. This court also ordered that [Father] participate in home-based case management services. [Father] kept and participated in three (3) out of fifty-two (52) possible appointments. Given [Father's] lack of participation, this service did not enhance his ability to safely and effectively parent [A.J.].

16. The one service for which [Father] has been the most consistent in attending has been his supervised visitation, making approximately seventy-five (75) percent of his recently scheduled visits. However, [Father] fails to appreciate how his missed visitations have negatively impacted [A.J.]. When [Father] no called and no showed one visit and then cancelled a second visit after [A.J.] had been transported to the visit site, DCS and the service provider instituted a procedure whereby [Father] had to

call the day before a visit to confirm that he was going to be there. [Father] was very resistant to this requirement and does not appreciate how this requirement was instituted in order to protect [A.J.'s] emotional well-being. [A.J.] was emotionally distraught after the missed visits and this requirement was put into place not to inconvenient [sic] [Father], but to protect [A.J.]. [Father] fails to appreciate this fact.

17. [Father] has a history of engaging in criminal behavior. In October 2014 [Father] was charged with theft and resisting law enforcement. [Father] pled guilty to theft in March 2015 and is currently on probation. After [Father] originally attended the CHINS hearings, he was soon thereafter charged with theft and resisting law enforcement in Howard County. In June 2014 [Father] pled guilty to theft and was sentenced in that matter. In June 2014, three (3) separate cases in Delaware County were combined and [Father] pled guilty to two (2) counts of theft, and criminal mischief. The chronological case summaries (CCSs) of [Father's] most recent criminal convictions have been entered into evidence and made part of the record.

18. [Father] testified that his behavior over the last ten (10) years has been terrible, that he suffers from substance abuse and emotional issues, and that he is unable to currently care for [A.J.]. The court agrees with this assessment, but disagrees with [Father's] request to extend him additional time to address these issues. [Father] has had ample opportunities to address his substance abuse, even while this termination case has been pending. In fact, the termination fact finding was originally scheduled to be heard on February 6, 2015. [Father] admitted that he was not engaged in any drug treatment program at that time. [Father] was also not engaged in drug treatment on March 20, 2015, when this matter was reset. This hearing was once again continued to May 22, 2015. And again, [Father] had not participated in any drug treatment during that time. The fact that [Father] re-engaged in treatment for his addiction in the last six

weeks or so does not supercede [sic] [his] pattern of failing to successfully complete or even engage in drug treatment during the approximately eighteen (18) months of the open CHINS case.

Appellant's Appendix at 95-98.

[31] As pointed out by DCS, Father does not challenge the court's specific findings. The record reveals that Father failed to attend mental health therapy sessions, failed to complete an aftercare program following an IOT program, failed to appear for meetings, failed to attend individual and group therapy sessions, and refused a drug screen as recently as May 4, 2015. On January 28, 2015, less than six months before the termination hearing, Father admitted to the CASA that he had too many emotional issues to raise the Children and that he was working on reuniting with Mother even though she was not good for him and that they tend to focus on drugs when together. At the July 24, 2015 hearing, Mocherman testified that Father missed a group session in the OAT program "[j]ust since June." Transcript at 62. FCM Garrison-Brown testified that she believed that the conditions which resulted in the removal of the Children will not be remedied. The CASA indicated that it was in the best interest of the Children to have the parental rights terminated.

[32] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there was a reasonable probability that the conditions leading to the Children's removal would not be remedied.

## Conclusion

[33] We conclude that the trial court's judgment terminating Father's parental rights is supported by clear and convincing evidence. We find no error and affirm.

[34] Affirmed.

Baker, J., and May, J., concur.